UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| DAVID WEHLAGE, | Case No. 07-CV-1852 (PJS/RLE) |
| Plaintiff, | |
| v. | ORDER |
| ING BANK, FSB, d/b/a/ ING DIRECT, | |
| Defendant. | |

---

Daniel E. Warner, WARNER LAW OFFICE, for plaintiff.

V. John Ella and David J. Duddleston, JACKSON LEWIS LLP, for defendant.

Plaintiff David Wehlage was fired in March 2006 from his job in the information-technology ("IT") department of defendant ING Bank, FSB ("ING"). At the time, Wehlage was in treatment for drug addiction, after having tested positive for methamphetamine use in November 2005. Wehlage sued ING, alleging that his dismissal violated Minnesota's Drug and Alcohol Testing in the Workplace Act ("DATWA"). Wehlage now moves for summary judgment on liability and also moves to amend his complaint to add a claim for punitive damages. ING cross-moves for summary judgment. For the reasons that follow, the Court grants Wehlage's motions and denies ING's motion.

I. BACKGROUND

The essential facts are undisputed. ING is an internet-based bank — that is, it does business with its customers over the internet rather than through brick-and-mortar locations. Wehlage began working in ING's IT department in early 2002. Some time in late 2003 or early

2004, Wehlage began using methamphetamine.  Ella Aff. Supp. Def. Mot. S.J. Ex. 1 ("Wehlage Dep.") at 14 [Docket No. 27].

Wehlage's pastor recommended in late July 2005 that Wehlage seek treatment for his drug use.  *Id.* at 17.  Wehlage told his immediate supervisor, Ken Przywara, on July 21 that he planned to get drug treatment.  The next day, Wehlage went to the emergency room at St. Cloud Hospital, and staff there referred him to an affiliated intensive outpatient treatment program.  *Id.* at 18, 39.

Wehlage entered that treatment program on August 9, 2005, and was discharged about a month later with instructions to participate in ongoing counseling.  Ella Aff. Opp. Pl. Mot. S.J. Ex. 2 ("Pl. Suppl. Interrog. Ans.") at 2 [Docket No. 33]; Wehlage Dep. at 38-39.  Wehlage did not work at his job between the time he spoke to Przywara in July and the time he finished intensive outpatient treatment in September; instead, Wehlage took some combination of vacation and short-term-disability leave.  Wehlage Dep. at 30.  The costs of the treatment program were covered by Wehlage's ING-sponsored health insurance.  *Id.* at 31; Pl. Suppl. Interrog. Ans. at 2.

Wehlage returned to work on September 12, 2005, after roughly five weeks of intensive treatment and about eight weeks of time off.  Wehlage Dep. at 31.  Although he took some additional time off the following week, he worked steadily from the end of September through early November.  Wehlage Dep. at 56-61.  Some time in October, though, Wehlage began using methamphetamine again.  *Id.* at 21.

Corey Donat, an employee in ING's human-resources department, asked Wehlage to submit to a drug test on November 9.  *Id.* at 61-62; Ella Aff. Supp. Def. Mot. S.J. Ex. 2 ["Donat

Dep.") at 46-47.  Wehlage admitted that he would test positive, but he submitted to the test anyway.  Wehlage Dep. at 63.  Wehlage followed Donat to a drug-testing center, left a urine sample, and did not come back to work.  *Id.* at 64.  Two days later, Donat called to say that the test was positive and to offer Wehlage two choices: take a severance package and quit his job, or go into treatment and use unpaid leave under the Family and Medical Leave Act ("FMLA").  *Id.* at 72-73; Donat Dep. at 55-56.  After thinking it over, Wehlage turned down the severance package and decided to enter treatment.  Wehlage Dep. at 73-74; Donat Dep. at 61.

In mid-November, Wehlage again entered a treatment program associated with St. Cloud Hospital, and program costs were again covered by his ING-sponsored health insurance.  Pl. Suppl. Interrog. Ans. at 2.  Wehlage's doctor told ING in late November that the treatment program would last until the end of February 2006.  Warner Aff. Supp. Pl. Mot. S.J. Ex. Y at WL 010162 [Docket No. 22].

At the end of January 2006, Wehlage completed the first phase of the treatment program and entered its second phase, which required intensive ongoing outpatient treatment.  Warner Aff. Supp. Pl. Mot. S.J. Ex. B.  In mid-February, Wehlage's doctor revised his estimate of Wehlage's treatment needs and said that he would need time off work for treatment through May 2006.  Warner Aff. Supp. Pl. Mot. S.J. Ex. Y at WL 010163.  In mid-May, Wehlage's doctor again revised his estimate, this time saying that Wehlage would need time off work for treatment through October 2006.  *Id.* at WL 010164.

Meanwhile, in mid-February, at the suggestion of employees of ING's human-resources department, Wehlage applied for long-term-disability benefits under his ING-sponsored insurance policy.  Wehlage Dep. at 139-40; Ella Aff. Supp. Def. Mot. S.J. Ex. 4 ("Rizzo Dep.")

at 53-58. His application was approved on March 8, and he received benefits retroactively to mid-February. Warner Aff. Supp. Pl. Mot. S.J. Ex. X at ING 0185.

Miriam Rizzo, an employee in ING's human-resources department who was responsible for administering benefits, then informed Wehlage, by a letter dated March 27, that he was fired as of March 1. *Id.* at WL 260037. Rizzo said that Wehlage's FMLA leave had been exhausted on January 10, 2006. She implied that by applying for, and receiving, long-term-disability benefits, Wehlage had caused himself to be fired. She wrote: "As of February 16, 2006, you were approved for long term disability . . . and therefore your employment with [ING] has been terminated effective March 1, 2006." *Id.* ING has never contended that Wehlage was fired because of poor performance.

Wehlage finished the second phase of his treatment program at the end of March and moved on to the third phase, which involved less-intensive outpatient treatment. Pl. Suppl. Interrog. Ans. at 2. He completed that portion of the program in early October 2006. *Id.* His long-term-disability benefits ran out in early July 2006, and in December 2006, Wehlage took a new full-time job at Medtronic Corporation. Wehlage Dep. at 103.

In late March 2007, Wehlage sued ING in state court, and ING removed the case to this Court in early April. Wehlage's amended complaint raises a single claim: He contends that by firing him, ING violated Minnesota's DATWA, Minn. Stat. §§ 181.950-.957.

II.  ANALYSIS

*A.  Summary Judgment*

1.  Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party.  *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006).  In considering a motion for summary judgment, a court "must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party." *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

2.  Liability Under Minnesota's DATWA

Minnesota's DATWA both limits the ability of employers to subject their employees to drug tests and restricts how employers may use the results of such tests.  The parties do not dispute that ING acted lawfully when Donat asked Wehlage to submit to a drug test in November 2005.  But Wehlage contends that because he entered a treatment program after that test, DATWA prohibited ING from firing him while he was in that program, and ING therefore violated DATWA when it fired him in March 2006.  Pl. Mem. Supp. Mot. Partial S.J. & Mot. Amend ("Pl. SJ Mem.") at 2, 16-18[Docket No. 21].  The Court agrees.

Under Minnesota law, most employment is at-will, and thus employees can be fired for any reason or no reason — with rare exceptions. *See, e.g.*, *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 741 (Minn. 2000). One of those rare exceptions is found in subdivision 10 of § 181.953 of the Minnesota Statutes, which limits the right of employers to fire or otherwise discipline employees based on the results of a drug test. Minn. Stat. § 181.953 subd. 10. Specifically, subdivision 10(b) of § 181.953 provides:

> [A]n employer may not discharge an employee for whom a positive test result on a confirmatory test was the first such result for the employee on a drug or alcohol test requested by the employer unless the following conditions have been met:
>
> > (1) the employer has first given the employee an opportunity to participate in, at the employee's own expense or pursuant to coverage under an employee benefit plan, either a drug or alcohol counseling or rehabilitation program, whichever is more appropriate, as determined by the employer after consultation with a certified chemical use counselor or a physician trained in the diagnosis and treatment of chemical dependency; and
> >
> > (2) the employee has either refused to participate in the counseling or rehabilitation program or has failed to successfully complete the program, as evidenced by withdrawal from the program before its completion or by a positive test result on a confirmatory test after completion of the program.

Minn. Stat. § 181.953 subd. 10(b).[1]

---

[1] A "confirmatory" test is simply a second test done on the same specimen after a first "initial screening" test has come back positive. From a practical perspective, the "confirmatory" test result is the only result that matters, since every positive initial screening test is followed by a confirmatory test. *See* Minn. Stat. § 181.953 subd. 10(a) ("An employer may not discharge, discipline, discriminate against, or request or require rehabilitation of an employee on the basis of a positive test result from an initial screening test that has not been verified by a confirmatory
(continued...)

The parties do not dispute that when Wehlage's November 2005 drug test came back positive, that result was Wehlage's "first such [positive] result . . . on a drug or alcohol test requested by [ING]." The only question, then, is whether, before firing Wehlage, ING met the two conditions specified in subsections (1) and (2) of subdivision 10(b).

Subsection (1) forbids an employer to fire an employee based on a first positive drug test unless the employer "has first given the employee an opportunity to participate in" a treatment program. According to ING, nothing in subdivision 10(b) requires that the employer offer this "opportunity" *after* the positive drug test. And in this case, ING contends that the treatment program that Wehlage attended voluntarily in August 2005 counts as the "opportunity" for treatment mandated under subsection (1). Def. Mem. Supp. Mot. S.J. ("Def. SJ Mem.") at 11 [Docket No. 25]. ING further contends that Wehlage "failed to successfully complete the program" under subsection (2) because his November 2005 drug test was a "positive test result on a confirmatory test after completion of the program." *See* Minn. Stat. § 181.953 subd. 10(b)(2). Thus, says ING, it was not forbidden to fire Wehlage under subdivision 10(b). Def. SJ Mem. at 10-11.

Although subdivision 10(b) is awkwardly worded, the Court finds, for two reasons, that the opportunity for treatment referred to in subsection (1) must be offered *after* an employee's first positive drug test. First, subsection (1) itself specifies that the treatment opportunity must be "either a drug or alcohol counseling or rehabilitation program, whichever is more appropriate, *as determined by the employer* after consultation with a certified chemical use counselor or a

---

[1](...continued)
test.").

physician trained in the diagnosis and treatment of chemical dependency[.]" Minn. Stat. § 181.953 subd. 10(b)(1) (emphasis added).  This language anticipates that the employer will have a say in what type of treatment the employee will receive.  But if the employee enters treatment voluntarily, before he is subjected to a drug test, the employer will generally *not* have a say in the employee's treatment program.  In this case, for example, ING had no input with respect to the treatment program Wehlage attended in August 2005.

Second, and more important, ING's proposed interpretation of subdivision 10(b) implausibly collapses the distinction between the two drug tests referred to in the statute.  By its terms, subdivision 10(b) limits an employer's right to fire an employee based on the employee's first positive result on a drug test requested by the employer.  And under subdivision 10(b)(2), if an employee has a positive drug test "after completion of the program," this test result establishes that the employee "failed to successfully complete the program" and can therefore be fired.  Under ING's interpretation of the statute, Wehlage's positive drug test in November 2005 was *both* the test that showed that his treatment in August was unsuccessful, *and* his first positive test result on an ING-requested drug test.

The statute plainly implies, however, that the two tests referred to in subdivision 10(b) — the first employer-requested test that comes back positive, and the post-treatment test that shows that treatment failed — are distinct.  One test is referred to in subdivision 10(b) itself, while the other is referred to in subdivision 10(b)(1).  But if a single test could satisfy both subdivision 10(b) and subdivision 10(b)(1), then the statute would mean:

> An employer may discharge an employee after a first positive
> result on a confirmatory test requested by the employer if that first
> positive result occurs after completion by the employee of a drug-

-8-

>or alcohol-treatment program that the employer gave the employee an opportunity to attend, even if the treatment program was not offered in response to a positive confirmatory test.

Such an interpretation would be contrary to the structure of subdivision 10(b) of § 181.953, which mentions, in order, (1) a first positive test result, (2) a treatment program implicitly offered *after* that result, and (3) the employee's refusal or failure to complete that program.

Moreover, such an interpretation would put an employee who voluntarily seeks treatment before being tested — that is, an employee who recognizes and seeks help for his problem on his own initiative — in a worse position than an employee who seeks treatment only after he tests positive on a drug test that his employer forces him to take. Under ING's interpretation of subdivision 10(b), a single positive result on a drug test can authorize an employer to fire an employee, provided the employee went through treatment at some point — possibly years earlier — before he tested positive. But under this same interpretation, an employee who did *not* go through treatment and whose drug use is revealed by a positive drug test *cannot* be fired based on a single positive result on a drug test. Instead, that employee must be offered an opportunity for treatment, and (assuming he completes the treatment program) can only be fired after a *second* positive drug test shows that the treatment failed. As ING would have it, the more-responsible employee would get one strike, while the less-responsible employee would get two.

Such a perverse result does not follow from the most natural reading of subdivision 10(b), and the Court does not believe that the Minnesota legislature intended that the statute be interpreted as ING proposes. Rather, the Court holds that subdivision 10(b) contemplates that employees who test positive on an employer-mandated drug test must *then* be given the opportunity to go to drug treatment.

This is not to say that an employer such as ING must allow an employee to remain in treatment indefinitely. But subdivision 10(b)(1) already gives employers some control over how long a treatment program will last: Before firing an employee after a first positive drug test, the employer must allow the employee to attend "either a drug or alcohol counseling or rehabilitation program, whichever is more appropriate, *as determined by the employer* after consultation with a certified chemical use counselor or a physician trained in the diagnosis and treatment of chemical dependency[.]" Minn. Stat. § 181.953 subd. 10(b)(1) (emphasis added). Moreover, it is well established that DATWA does not limit the ability of employers to fire employees for reasons unrelated to testing positive for drugs. *See, e.g.*, *City of Minneapolis v. Johnson*, 450 N.W.2d 156, 160 (Minn. Ct. App. 1990) (holding that Minn. Stat. § 181.953 subd. 10 "prohibits discharge based on an initial drug test, but does not prohibit a discharge based only upon other reliable evidence").

In this case, Wehlage's doctor first estimated that because of his treatment program, he would be unable to work from November 2005 through February 2006, or for roughly four months. Warner Aff. Supp. Pl. Mot. S.J. Ex. Y at WL 010162. In mid-February, the doctor revised his estimate, saying that Wehlage needed time off for treatment through May 2006. *Id.* at WL 010163. And in mid-May, the doctor revised his estimate again, saying that Wehlage would need time off for treatment through October 2006. *Id.* at WL 010164.

Even if Wehlage was unable to work for eleven months (i.e., from November 2005 through October 2006), he was not deprived of the protections of DATWA. If the Minnesota legislature had desired, it could have easily allowed employers to fire not only employees who failed to complete their treatment programs (as permitted under subdivision 10(b)(2)), but also

employees who remained in a treatment program longer than a certain period of time. But DATWA contains no such time limit; instead, it controls the length of treatment only indirectly, by allowing the employer to determine, in consultation with health-care professionals, what type of treatment program is appropriate. Accordingly, the Court will not read a time limit into the statute in this case.

Because DATWA required ING to allow Wehlage to participate in a treatment program after his first positive drug test in November 2005, DATWA implicitly prohibited ING from firing Wehlage for absenteeism while he was participating in that program. The Court therefore rejects ING's contention that it justifiably fired Wehlage for absenteeism. *See* Def. SJ Mem. at 8. Absenteeism that results from an employee's attendance at a treatment program in accordance with subdivision 10(b) is not an independent basis for termination apart from the positive drug-test result that led to the treatment.

Wehlage is therefore entitled to summary judgment that ING violated DATWA by firing him in March 2006. The extent of his damages remains an issue for trial.

*B. Punitive Damages*

Punitive damages are generally available under Minnesota law "only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others." Minn. Stat. § 549.20 subd. 1(a). Further, as a procedural matter, plaintiffs may seek punitive damages under Minnesota law only with the court's permission. Minn. Stat. § 549.191. A court must grant such permission if the plaintiff provides "prima facie evidence in support of the motion . . . ." *Id.*

In light of the substantive standard for the award of punitive damages, "prima facie evidence" sufficient to allow a plaintiff to seek punitive damages is evidence that, if believed, would allow a jury to find by clear and convincing evidence that the defendant acted with deliberate disregard. *See McKenzie v. N. States Power Co.*, 440 N.W.2d 183, 184 (Minn. Ct. App. 1989); *see also Bjerke v. Johnson*, 727 N.W.2d 183, 196 (Minn. Ct. App. 2007) (citing *McKenzie*). In determining whether prima facie evidence supports a punitive-damages claim, the court must accept the plaintiff's evidence as true. *See Swanlund v. Shimano Indus. Corp.*, 459 N.W.2d 151, 154 (Minn. Ct. App. 1990); *see also Olson v. Snap Prods., Inc.*, 29 F. Supp. 2d 1027, 1034 (D. Minn. 1998).

Wehlage's evidence demonstrates that although ING's employee handbook included a drug-testing policy based on DATWA, the employees involved in the decision to fire Wehlage gave no thought to that policy before firing him. Donat, the human-resources employee who asked Wehlage to submit to a drug test, could not recall whether he reviewed ING's DATWA-based policy when ING decided to fire Wehlage. Donat Dep. at 27. Indeed, Donat seems to have had no idea whether DATWA limited ING's ability to fire an employee who was in a drug-treatment program. *Id.* at 24-27.[2]

Miriam Rizzo, a benefits manager at ING's Delaware office, was the person who decided to fire Wehlage in March 2006. Rizzo Dep. at 62. She based her decision on the fact that

---

[2]Donat also plainly misunderstood what type of drug testing DATWA authorized: He characterized the November 2005 drug test that he asked Wehlage to take as a random test, when it was in fact a "treatment program" test. Donat Dep. at 40-47; Minn. Stat. § 181.951 subd. 4 (authorizing random testing), subd. 6 (authorizing "treatment program" testing). Because the test was in fact authorized by DATWA, this misunderstanding, by itself, is unimportant. But it reinforces the fact that Donat had, at best, a shaky grasp of DATWA.

Wehlage's FMLA leave had expired and she did not know when he intended to come back to work. *Id.* at 66-67.

Although Rizzo was aware that Wehlage was off work because he was in drug treatment, she did not consider DATWA in deciding to fire him. *Id.* at 48, 52, 67. Indeed, Rizzo was unaware that DATWA existed. *Id.* at 48. Notwithstanding the fact that she was responsible for ING's employees in Minnesota, Rizzo ignored the section of ING's employee manual discussing Minnesota's DATWA because she personally was a Delaware employee. *Id.* at 50-51.

Further, Wehlage's superiors in the IT department did not consider whether DATWA limited ING's ability to fire him. Ken Przywara, Wehlage's immediate supervisor, knew nothing about DATWA and had only a vague understanding of ING's corporate drug-testing policy. Ella Aff. Supp. Def. Mot. S.J. Ex. 3 ("Przywara Dep.") at 20, 27, 42-44, 74. Likewise, Przywara's boss, Cynthia Allen, knew nothing about DATWA. Aff. Supp. Def. Mot. S.J. Ex. 5 ("Allen Dep.") at 29. And both Przywara and Allen left the decision to fire Wehlage entirely to Rizzo. Przywara Dep. at 71-72 ("I was not aware, as his supervisor, that his — that he was terminated."), 82; Allen Dep. at 39 ("I didn't think he was terminated."), 55.

In short, there is no evidence in the record that any of those who were actually or potentially involved in deciding to fire Wehlage gave a moment's thought to DATWA, despite the fact that ING's employee manual contains a section on DATWA. Perhaps Rizzo discussed DATWA's implications with respect to Wehlage with ING's in-house counsel, but ING asserted the attorney-client privilege as to such discussions, so there is no evidence regarding what Rizzo may or may not have asked, or what an attorney may or may not have told her. Rizzo Dep. at 63-66. The Court therefore finds, based on the evidence in the record, that Wehlage has made a

prima facie showing that ING acted with "deliberate disregard" for his rights under DATWA. Wehlage is entitled to add a claim for punitive damages to his complaint.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. The motion of defendant ING Bank, FSB, for summary judgment [Docket No. 23] is DENIED.

2. The motion of plaintiff David Wehlage for partial summary judgment as to the liability of defendant ING Bank, FSB, for violating DATWA [Docket No. 19] is GRANTED.

3. The motion of plaintiff David Wehlage for leave to amend his complaint to add a claim for punitive damages [Docket No. 19] is GRANTED. Wehlage is directed to file and serve a copy of his amended complaint within ten days.

Dated: November 5, 2008     s/Patrick J. Schiltz
                            Patrick J. Schiltz
                            United States District Judge